I have one case being argued today. I see the lawyers are ready to go. That's Daly v. Westchester County Board of Legislators. And I want to welcome Judge Rustani from the U.S. Court of International Trade. I want to thank her for sitting with us today despite her busy schedule. So, Mr. Sussman, I see you reserved three minutes for rebuttal. You can begin when you're ready. Thank you and may it please the court. This case raises three issues. I'll deal with them briefly in order as they have been fully reviewed in the briefs. The first issue is whether the district court properly precluded the ADA claim. The district court's reasoning was that there was a discrimination claim filed with the EEOC. It did. This is at JA 112. Note disability as the basis for the claim. There was no place in that form to separate disability from perceived disability. The district court found, though, notwithstanding that, that the nature of the statement did not give notice that there was a perceived disability claim. I would submit with regard to that that the court erred because, in fact, if you read the brief description by my client at page JA 112, he would indicate that there are no possible reasons for my termination other than my disability status. I think that's ambiguous. It could be read either way, but it's sufficient for a pro se litigant to give notice, especially with the reasonable investigation would have, in fact, spoken with him and he would have further explicated the matter, Your Honor. Yeah. The judge did go on to examine the merits. So let me just ask you a question about that. First, you're only appealing with respect to regarded as clean, correct? Yes, Your Honor. You can correct me if I'm wrong, but obviously the decision maker here was Boykin. Yes, Your Honor. He would have to know about the perceived disability, right? He'd have to know about the disability in order to perceive it as a basis. And you can correct me if I'm wrong, but I think your client said in the deposition that he never told Boykin directly that he was disabled in their two meetings in January and February. Didn't come up, correct? He did say that. All right. And he's relying on an assumption, an inference that because he told Friedman that Friedman told Power, the new chief of staff, and that Power told Boykin. Is that the theory of the case? No. It's part of the theory of the case, though. You agree if that was the theory of the case that that would be pretty speculative, that that wouldn't be enough to go to a jury? I think it might be too speculative. All right. So tell me what the evidence is besides that.  So the pieces of evidence that are explained in the affidavit which he submitted and also in the deposition and also in the second amended complaint, there are three other matters that he raised. And I'm not going to address them in the second procedural matter right now. I'll get to that if the court wants me to. I'll address the merits just so it's clear. Okay. My client indicates that there was a meeting, first of all, that his first contact with Boykin, Boykin told him that he was very, he had talent, he recognized his talent. He was going to be there a long time. This is why I think it goes a little beyond what the Court elaborated. He says that occurred in January. He says in February, in early February, there was a meeting. There was a different tone at the meeting, a meeting of greater hostility. At that meeting, there was a question posed by Boykin about his capacity to do certain work, which he answered. He says he answered in 15 seconds given to answer, but he answered it and he was able to do that work. He then says that he was pressured at that point to acknowledge he couldn't do the work. He does state in the deposition that disability did not come up, but he says there was hostility events towards him in that meeting. This is the meeting on February 2nd. Then he says he overhears Boykin speaking to staff, acknowledging that my client was disabled. All right. That, that, I saw that, but that's in the affidavit, correct me if I'm wrong, for the very first time in this litigation, that your client never, in the EEOC complaint, in his complaint with the court, in his deposition, never mentioned that there was this overhear where Boykin referred to him as disabled. There was never any question. I agree that it's not stated in his deposition. I also agree that it's not asked specifically in the deposition. Let me point you to page 342. Are we at the joint appendix 342? I'll read it to you. You don't have to. I have it. Okay.  Was any reference made to your disabilities either by Ben Boykin or Dennis Power? Answer, no. Question. Was any reference ever made to your knowledge by Ben Boykin, Dennis Power, to your disability at all? Answer, no, not at all. So if you overheard Boykin referring to your client, overheard him being referred to as disabled, I think he said it in the affidavit, he said, but he's disabled, right? That Boykin said, but he's disabled. To a staff meeting. Right. Why doesn't that contradict what he said? Because I understand the question. He was asked specifically in the context that the Court's referring to of a series of meetings he held directly with Mr. Boykin. I think, as he says, his understanding of it. That was the first part of it. But when someone says, was any reference ever made? Ever is ever in meetings you were at. I mean, if I asked you, were you in a meeting with Joe Smith, did he ever say X? That would implicate what he said in the meetings. Why would he have put that in his complaint? I know he was pro se, but if the decision-maker who fired you referred to you told someone else, but he's disabled, we can't keep him, don't you think he would have put that in his complaint? Instead, what he put in his complaint was that he was pressured, they referenced disability at the February meeting, and he was pressured to do that, yet at his deposition he said that that didn't happen. That he didn't refer to disability. So he kind of switched in his complaint. He said he referred to disability at the February meeting. He disavowed that at the deposition. And then he came up with something entirely different in an affidavit in opposition from summary judgment. And you know, I think you know, I'm sure you know, that you can't create an issue of fact for the first time in an affidavit in response to summary judgment. That contradicts your sworn testimony. In his fact, the First Amendment complaint, which is incorporated into the Second Amendment complaint, he does speak, and I'm pointing to paragraph 44, excuse me, where he explains the hostility that was evinced to him in this meeting in February. Even if one assumed for the purpose of argument that he, you can't consider, as you say, and I understand the doctrine that you're relying upon, can't consider a statement made in an affidavit, I would still submit there's sufficient evidence, given Freedman's role in the process, given the rationality of, you say, too speculative, that he would explain to his successor the status of this employee. I understand that there's no direct evidence of that, but it's reasonable to believe that happened and explains the difference in tone between what was said to him initially, which is in the fact that he was a talented, we expect you to stay around for a long time, and what occurred thereafter. So I think that there is still enough, even if the Court were to discount the direct evidence, direct evidence obviously is not required in a case, even if you discount the direct evidence. And just to make one other point, I'm going to take from my rebuttal time, but I understand that. Thank you. The other part of this that's important is the nature of the reasoning that the county gives. The county spends most of its time, honestly, focusing on the performance deficiencies that they claim my client evinced during the time that Kantoritz and Freedman were his more direct supervisors. But with regard to that, it's very clear in the depositions that Boykin disclaimed any knowledge of that. Powell disclaimed any knowledge of that. There was no communication with regard to that. But it could still support, if you're putting it all before a jury, that that would still come in for the jury to see that potentially that Boykin, when he interviewed your client and concluded that he was not at the level of competence, that it wasn't pretextual. Because, in fact, people independently years ago, from the very beginning, had concluded that. In fact, there was an e-mail switching his job duties in 2016 because they didn't think he could do the job. Right? Isn't that uncontroverted? I believe it is uncontroverted. So a jury could consider, when we're trying to decide would a rational jury conclude that, but for a perceived disability, he wouldn't have been terminated, they certainly consider the fact that people independently over the years had come to the same conclusion as Mr. Boykin had. I'm with you that a jury might be able to view and conclude that. But a jury might also be able to view and conclude that none of the deficiencies that you're relating to and that Kathy related to, if they were so serious, were ever really communicated to my client. That's the testimony. All right. Sorry. So I think the point is you're right. A reasonable jury could consider a lot of things. But I think grant for summary judgment on these facts was inappropriate. Thank you. All right. Thank you, Mr. Sussman. Mr. Whitehead. Yes, Your Honor. May it please the Court. I think, Your Honor, it's right down, going down the road, which this Court needs to go down. I think this Court has to look at it as this was an independent assessment by Mr. Boykin. He came in. He interviewed everybody. This was a change in administration. You had Astorino going out. You had George Latimer coming in. You had new elections at the Board of Legislators. And you had a new appointment of a chair who did an assessment of each employee. And that's why we don't, yes, it is evidence of Mr. Daley's job performance, all the stuff that happened before 2018. But again, Mr. Boykin did an independent assessment, him and his chief of staff. He interviewed every employee, including the two employees, including the one employee, Greg Casciato, that had done a large portion of Mr. Daley's job. So that is reason to conclude that Mr. Boykin spoke to Greg Casciato about the fact that he was doing Daley's job. And then also, when they interviewed Mr. Daley over two days, each employee got one interview. Mr. Daley got two interviews because he could not answer the questions adequately and appropriately during his first interview with Boykin and Powell. So we rely on that. And we also submit that the district court got it right. Mr. Daley did not approve a prima facie case. And if this court will, I'll move on to the pretextual argument. Again, we rely on Mr. Boykin's independent assessment. There was no pretext. And again, there was a break. There was a break in the administration. Freedman left.  And one last point. Mr. Daley, although he requested this leave, this leave was never done in any official capacity, as he had done on prior occasions. And one last point. His supposed disability never rose, that's our other argument, never rose to any injury that would limit, substantially limit. The law changed on that. The statute now says if it's a precept, regarded as claim, you don't have to have the regarded as substantially limited. You understand what I'm saying? Yes, Your Honor. And I'm glad you bring that up. And the evidence, and we cite all the reasons in our brief, he never told anybody about this injury, this disability, supposed disability, except for a co-worker. He came, his attendance was near perfect. He came to work every day. He walked to the train. He came all the way from Brooklyn. He attended. He himself said that his injury did not affect his ability to do his job. I guess the thing is, the only person that matters is Boykin. Did Boykin perceive him as disabled? If there is a true conflict between his affidavit and the deposition, then we discount his statement that I heard Boykin say, oh, Dante is disabled. Suppose we don't have a true conflict and that there's a way to explain it, like he's only talking about one meeting or another meeting. Then what do I do with that statement and the affidavit that is out there? I mean, it's evidence. Yes, Your Honor. I'm glad you bring it up. I think what you do with that statement is, Daley admits that he never told Boykin all power. He admits in one meeting when he comes back from, he was out with the flu, the only time he ever told Boykin about his supposed disability was, and I quote, I have a bad back. That's the only thing he ever told Boykin about his back. Well, that doesn't really contradict his affidavit because Boykin could have found out some other way, right? Well, that's, you know, I think you have to draw an influence. I don't believe that would be a, based on the record, I don't believe that would be a reasonable affidavit. If there wasn't a conflict and there was an over here where he referred to as disabled, then you might have other arguments that there was a non-discriminatory reason, but you couldn't say he didn't have a prima facie case of no knowledge of a perceived disability if, in fact, he referred to him as disabled, right? You're relying on the fact, I thought in your briefs, which I was questioning Mr. Sussman about, that you can't create an issue of fact from an affidavit. We are, Your Honor. Yes. Let me just ask you about the exhaustion. I know we don't necessarily have to reach it, but I'm a little troubled by this idea that, you know, a pro se, someone who doesn't have a lawyer, fills out an EEOC complaint, there's no box for regarded as, that they're going to somehow independently frame it as a regarded as claim. The argument is, and there's some cases that go both ways on this, but that the EEOC, it's part of their reasonable investigation if someone's claiming they fired me because I'm disabled, that they will look at whether or not there was a perception of disability if there wasn't an actual disability. So wouldn't it be a little bit too strict to say, unless you reframe it as a regarded as claim, it's not exhausted? Well, Your Honor, I think it goes back to what Judge Rustani said, I believe. I mean, once Daly said in his EEOC complaint that I unequivocally told my supervisor that I was disabled. That's what he said. He said, I told my supervisor, I had a conversation with my supervisor, and I told him I was disabled. Then the EEOC is going to focus on, again, what Judge Rustani said, it's going to focus on what Boykin believed, not necessarily what, not what. I know, but then it's an argument that it was exhausted. I thought you were agreeing with me. No, no. You're saying they would necessarily, having gotten his complaint looked at. No, no, I'm sorry. They're going to focus on what, you're right, I misspoke. Yes, they're going to focus on what Daly, his disability, they're not even going to look at. Because he, Daly says, I told my supervisor, Chairman Boykin, that I was disabled. I don't work for the EEOC, but if I looked at the case and I'm like, okay, he's not disabled, doesn't meet the criteria for disability, but he's saying he told his employer he was disabled and then got terminated, why wouldn't they naturally say, well, maybe he perceived him as disabled because he told him he was disabled. Wouldn't that be a natural thing for the EEOC to do if a person says, I told my employer I'm disabled and I got fired? I don't think so. All right. Can I ask a question? Yes. You are contending there's no prima facie case. Correct. Okay. One, because the person who did the firing did not know that he was disabled, so he couldn't have fired him for that reason. But what about qualified? Is he qualified to do the job? Is that in play here or is that accepted? No, Your Honor. I think that's our underlying basis for why Boykin terminated the opponent's job. Mr. Boykin and his chair had extensive knowledge of finance. They had worked in the financial industry. In fact, Mr. Boykin was president of Nabisco for 20 years. I think he retired as the assistant treasurer. Powell worked for, I believe, one of the big five firms as an accountant. They had extensive experience in the financial industry, and they conducted their own assessment as the new chair coming in and as the new chief of staff, and they determined that Daley did not adequately or sufficiently answer their questions in order to do the job. And also they had interviewed ñ they had done this with everybody because, as this court knows, when a new administration comes in, a new legislator comes in, Mr. Daley being a natural employee, that does not guarantee his job. And so they had done their independent assessment. And this is irrespective of what happened in the past. Now we can also ñ we also argue in our brief that since Benjamin Boykin was a legislator there, you know, he could ñ and he was around. There's also a reasonable inference that he knew that Mr. Daley was not performing the job up to tax. But he also ñ they also spoke to Mr. Casciato, who was performing his job when they first came in. And so you can ñ this court, I think, as long as ñ as well as district court can draw an inference that Casciato told Mr. Boykin that, hey, I'm doing the bulk of Daley's job, and then coupled with the fact that Daley cannot answer his questions satisfactorily, I think that forms the basis of ñ I submit that forms the basis of Daley's termination. Are there no more questions? All right. Thank you. Mr. Sussman, you have three minutes to move on. Thank you for honoring that. I appreciate it. Before you get in, Mr. Sussman, let me ask you a question that we haven't touched on yet, which is it looks to me from your briefing, both your main brief and your reply brief, that you've abandoned the retaliation claim. Is that right? Yes. Okay. Thank you. Okay. Let me address what I see as the fundamental issue on the merits, because that's ñ two of you have asked a number of questions about that. Mr. Daley had been performing a revised job, as Judge Bianco pointed out, for a period of approximately four years. In that period of time, according to the amended complaint, as well as according to his deposition, there had been no commentary made directly to him about performance. Counsel is up here saying he couldn't answer questions with regard to certain points raised. His testimony and his affidavit indicate he answered the questions. This is a very prototypical situation that we have on summary judgment motions. The defendant comes in and says, here are my reasons, X, Y, and Z, and the plaintiff says, wait a minute, those reasons are not true. That's not what happened. As Judge Bianco says, and I understand the point, there's a history, at least a documented history, even if it's not known to your client, you're not making the claim that they told them, but it's not known to your client, but there's a documented history of nonperformance. The gentleman gets up and says, Mr. Borkin was a member of the legislature, and even though when he's asked specifically about his knowledge of past deficiencies, he doesn't claim to have that knowledge. And you hear the claim that the decision is made based on this interview he has with my client and one other individual. My client says, wait a minute, that wasn't what was going on. I was doing the job I was supposed to be doing, which was going to meetings, providing the budget analysis for the county on a year-to-year basis, helping develop the budget, et cetera. So if my client is correct, and he was doing those things, and no one was coming to him and saying whatever they were doing under the table, behind his back, he doesn't know that. You're doing okay. If the guy comes in and says, I hear you have a lot of talent, or I see you have a lot of talent, and that happens in January, which is not disputed in the record, and you have to take that as a fact in the case. And then two or three weeks later, he changes his view toward my client. And on February 2nd in the meeting, again, this is the record taken most favorably to plaintiff, evinces this hostility toward him, and as my client puts it, in the fact and in his deposition, he's applying pressure. You're right, Judge Bianco, he doesn't mention disability, but he's asking questions about can you do the transportation, are you able to do this, are you able to do that, which seem related to a disability, and that's what's in the fact, paragraph 44. Then an inference can be drawn that he has been told by Freedman about this, which Freedman didn't leave the county. He did leave the Board of Legislators. He didn't go anywhere distant. It wouldn't be unusual for an incoming person to have a briefing with a prior supervisor and find out things especially of this nature. So, again, it's a question of what do you talk the – I don't mean to interrupt you, but you said something that, again, I don't think your client said at the deposition, this idea that he has trouble with transportation. You're saying he told that to Boykin in the February meeting? I'm looking at the fact, page 92, JA92. Which is what? This is the First Amendment complaint, which is incorporated in the Second Amendment complaint, and he explains they applied pressure on me to say that I was unable to perform job duties requiring additional transportation and additional transportation physical strength. That's what he writes. I know, but I'm at his deposition. During a conversation with Chairman Boykin in January and February, did you ever mention a request for accommodation for the conversation with Gary Friedman? No. Okay. Did you ever provide any indication of a disability that you were suffering from? No. But that's not inconsistent with that testimony. That testimony is what they were saying to him about his capacity to do his job. It's not inconsistent with what you just read. And I think this is the point. And I'll end with this. But the record, Reeves says, and it's not been controverted by the Supreme Court in the years since, that defendants' version of events, unless a jury has to accept that version of events, is to be rejected by the district court on review by this court. That's what Reeves says. And in a situation like this, they have a version of events. I'm not denying that. But the point is a jury should be able to assess the entirety of the situation to determine whether Boykin is telling the truth that he didn't know about the disability given the circumstances. Thank you. All right. Thank you, Mr. Sussman. Thank you, Mr. Whitehead. We'll reserve decision. Have a good day.